Case numbers 22, 1919 and 22, 1939. Michael Pung v. Peter Kopke, et al. Oral argument not to exceed 15 minutes per side. Mr. Ellison, you may proceed for the Appellant Cross Appellee. Thank you. Good morning. Philip Ellison appearing on behalf of the Appellant Cross Appellee who's in the courtroom today. I'm reserving three minutes for rebuttal. We have a whole smorgasbord of issues that you can draw from today, but I think they boil down into two main camps. One is of course is the fair market value slash Eighth Amendment issue that I've raised as part of this case, which I believe this court can distinguish or otherwise take free one step further. And of course the second tranche of this case is the Pickens-DePriest and Kopke issues involving the removal of the PRE credit for the winter 2012 taxes. I'm of course very happy to answer any questions in whatever order, but otherwise I'll proceed very briefly on the fair market value issue first. And on that one, I mean, I'll just tell you, I'll just be candid. You know, I think, are you familiar with the Bancorp case? I am. You know, and so that was the bankruptcy context and and so Justice Scalia there said, you know, the valuation of the property in bankruptcy, the fair value, must take into account the lawful fact of the bankruptcy itself. And it would seem like the same reasoning would apply here, that the foreclosure, I mean, you have an unusual circumstance. You're contesting the legality. But in the mine run case where the legality of the foreclosure is not contested, that too would seem to be just a, you know, a fact we must take into account. And so then we look at, then the entitlement would not be to fair market value with a realtor and all that program, but instead the value that one would get at a properly conducted foreclosure sale. And I think that's what makes this case distinguishable, because Judge Yonker, who originally had the case when it was in the Western District, originally dismissed this case on 12b-6 pleadings on the basis that, on this theory that the 8th Amendment claim was somehow an alternate claim to the 5th Amendment, but he didn't grant the entirety of the 5th Amendment relief. I would argue, I was the lawyer on Freed, I mean, you probably caught that in your research today on this. One of the things that they faulted me for in the Freed case is that I didn't develop the idea that the auction was the actual process itself that resulted in the outcome of the price of that auction was well-developed. By the time this, by the time Freed was decided that got to that point, Judge Yonker had already dismissed the 12b, on 12b-6, the pleading on this aspect. It's my position, the 8th Amendment excessive fines clause. Now, the reason why I say that is... I know we decided that for everybody in Hall, I'll say that. Well, and I, and of course we have some similar players from this case and from Hall as well, and Hall, I think, I mean, I think you can distinguish it on different circumstances result in different things. And in this situation, at least our position, is we never owed the tax. I think it's pretty clear that we didn't really owe the tax, but we got locked into owing the tax in that respect. I mean, you know, I'm quite sympathetic to the facts that you recite, but, you know, a final judgment from a state court is not something we can revisit here. I don't disagree with that. However, what I am challenging, though, and I think where this court can go forward is to say on an 8th, if a plaintiff like Mr. Pung can establish that the auction resulted in an unfair price, meaning we go through and look at how the auction actually was conducted itself, because I don't know how else you can, looking at these facts, how can a property that I alleged in the, from the very beginning... Let me ask you this, and I understand that we've seen these cases before. Sure. In some of these Michigan statutes, it looks like there's like some insider stuff going on with these auctions, whatever it is, okay? I just don't see the allegation in your complaint, really, about that process in this case. Am I missing something? You're not missing. You have to realize, when this case started, this was all before Raffaelli, before Freed, before... Yeah, but it's still something that you could have said, hey, look, this auction is basically irrational. It really didn't result in a market price. You know, it was, you know, only one person showed up, or they didn't put the notice in the right paper, or whatever. You know, there could be all kinds of reasons why an auction would be a problem. It wouldn't approximate anywhere near a fair market value, right? I would agree. But I don't see anything in your complaint that says what that problem was here. Well, I guess I'm going to say, in fairness to me, at that point, this area of law was still developing at that particular point in that aspect. So, the problem that I run into is, is that, how can it be a fair process that when a piece of property that we allege was worth $194,000 sold for $76,000, and literally just after the first purchaser bought it, turned around and sold it for really within $600,000, which in property appraisal rule, being within $600 is, that's on the money. I mean, that's the same. There's no practical difference. But, I mean, I would go back to the distinction I mentioned at the outset between the distressed market value and the, you know, full broker, you know, treatment, advertising, et cetera, market value. And they're two very different things. And it does, I mean, correct me if I'm wrong, but it seems like the Freed case does establish the proposition that if there has been a foreclosure sale whose propriety is not challenged, then the number you get in that sale is dispositive of the, what I call, the distressed market value of the property. But that's where the Eighth Amendment claim, I think, provides. Even if it's just. But now, that's, I'm just speaking to the Fifth. Why, I just, you know. Well, that's where, that's where I'm, I guess I'm asking this court to do really two things. There's really kind of two pathways you can go down on that. One is, is I'm asking this court to either revisit or distinguish Freed is one theory. On the Fifth Amendment grounds, first of all. Why, though? Because I think the fact that the panel got it wrong because the standard that the Supreme Court has provided is that it's always been fair market value. It's not the, this artificial auction. Because if really this auction is more of a fire sale type auction in that respect. Well, we can't overrule a panel. I agree. But the second part then would be. Why wouldn't that claim be true in every single foreclosure in Michigan where the taxing authorities use an auction? Why wouldn't, I'm not saying that you should win or lose because of the answer to my question. But why wouldn't everybody be able to make this claim? Because in my estimation, if you're going to sell a piece of property and to get, because the whole point of this is that when you sell a piece of property, in a mortgage context, for example. If you undersell, a bank undersells a property at the sheriff's, there is a cause of action that allows for you to get the balance if it's purposely or even negligently undersold in that respect. You have to make that showing. You're not, you haven't made any showing of a negligence in the auction. So I'm just, it's a pretty simple question. Why couldn't everybody make this, the claim that you're making? Because I would hope and I would expect, at least in the outside of the normal context, in the normal case, that the auction sale gets at or approximately the fair market value of the property when it's sold at a tax auction. Here, though, we have an example of where it was sold. How is anybody going to ever know whether the auction was proper without then seeing what the price is, then what you have an appraiser sitting behind you saying, well, okay, that sounds like that's close enough to what I think it's worth. You're just asking for something that's not workable. Well, I disagree. And the reason why I would respectfully disagree is I know you're from Michigan. We get our tax bills from our local township assessor or city assessor, and we get them on a biannual basis. We have a state equalized value that actually is this Michigan, which I think distinguishes it from, we've been talking about tariff fee quite a bit in this area of practice that I'm in. Ohio does it every six years. Michigan literally does a new assessed value every year. That's the government's determination. And you and I both know that number has no correlation to what the fair market value of that property is. It has to. It's because of the Headley Amendment. No, that is the assessed value. I'm talking about the state, the SEV has to be 50% of the. Would you sell your property at home for what the state says it's worth? My home? Oh, yes. Right now, for what, 90? Absolutely. SEV is half of the fair market value. You double the fair market value on my tax bill, and it's probably half of what the property is worth. Then you probably need a new tax assessor for your jurisdiction then, unfortunately. Why would I want to be hired? Why don't you give us a few minutes, what your time, I mean, I don't mean to. No, I think we're done with that. I mean, the fair market thing, I mean, you've heard our question. So what about the other part, you know, the more conspiratorial? Let me be specific about the Kopke, what I'll call the Kopke claim. I realize that it was dismissed under 12b-6. So I realize that, generally speaking, we look to what you said in the complaint. And you got a lot of language in the complaint that Kopke, personally, was seemingly in cahoots with these two Michigan tax officials. Now, we know more about that, because although that was dismissed, the other claims have continued. So what evidence do you have that the guy from the tax tribunal was in some sort of an agreement with these other two tax officials that contacted him in his capacity as the clerk of the tax tribunal to somehow take advantage of your client? When I pled that claim, I had, the only information that I had available was whispers and innuendo at that point. We did not have the details of it, because I wasn't privy, nor was my client privy.  I'm not asking you to go back and explain why it was. I'm just asking you, what evidence do you have? Because all I can find in the record is the deposition of the two tax officials. That's all we have at this point, because I was not allowed to depose. No, I read those two tax officials' depositions. And they don't assist, from what I can see, they don't seem to assist that he was, your claim that he was somehow more involved than simply answering questions in his capacity as the clerk of the tax tribunal. But we don't know that, because I wasn't allowed to ask Mr. Kopke any of that information. We know at least there's a dispute as to what happened, because Mr. Kopke offered an affidavit, which was kind of odd in the 12. My question is pretty specific. What information do you have? Not what information don't you have. So the answer to the question, as I understand it, is you have the depositions of the two tax officials. The two tax officials. We also have the affidavit of Mr. Kopke himself, who said, I never talked to Ms. DePriest, ever, about this. She testified in a state court proceeding. And we also have the state court proceeding itself where Ms. DePriest actually testified as to what she said she called and talked to Mr. Kopke about. Either Ms. DePriest is being untruthful, or Mr. Kopke's being untruthful with his signed declaration. The gist of the other testimony you just referred to that you think is helpful to your case with respect to what Judge McKee gave. The gist of the testimony was, at least her testimony was, is I talked to Mr. Kopke, and Mr. Kopke told me I had to take away the Homestead credit, even though I had already granted it. Mr. Kopke offered an affidavit, and I believe it was improper. So let's stop right there. So how does that tie into your theory that he was somehow in cahoots with these other two officials to take advantage of your client? Because he was the one. Let's just assume he's dead wrong. Because assuming he's dead wrong, we also have the testimony of, I mean, I can, I mean, okay, all right, fair, we also have the testimony from Mr. Pickens himself where he said he actually talked to, and he actually conceded he talked to Mr. Kopke at the Treasurer's Conference saying, oh, these issues have come up on this, and this back and forth with him in this respect. Co-conspirators are not going to reveal their conspiracy in court. They're going to lie about it in that respect. I'm just trying to figure out from a common sense standpoint. This guy is the clerk of the tax tribunal in Lansing. Something's going on. Let's assume there is some sort of nefarious conspiracy out in the county where this all happened. What incentive does Kopke have to get involved? We're trying even under 12B6 to figure out whether your allegations against Kopke are plausible. And it just seems to be totally implausible. So I'm trying to give you an opportunity to tell me why, from what you've learned, your allegations are plausible. Why I think it is all you've said so far is that you think one or the other of them, Kopke or the woman, lied. That's all you've said so far. Well, what I think has happened is Mr. Kopke was angry by the fact that Mr. Pong was trying to interfere with the prior ruling of the tax tribunal and was trying to undercut it in that respect. Mr. Kopke has since become an ALJ on the tax tribunal itself. One last question, and I know we're out of time. It just seems to me, I know he didn't plead this, and I know it's the obligation of the state, but this seems to me clear-cut absolute immunity question. Well, everything that he did, at least from what you pled, was in his capacity as the chief clerk of the tax tribunal. No question that was an official action. No question on that. That's how you get your state action in 1983. I agree. So he did everything, even if he was dead wrong and had a mal-motive, he did everything in his capacity as the clerk of the tax tribunal, didn't he? But if he was in a conspiracy to deny someone their due process rights, to deny them the ability to protect their property right from being taken without a proper due process, it is clearly established that before a property right can be taken away in this circuit, this is Sterling Hotels, this is O'Connor, these are the cases that have said it's clearly established that that right exists, and that you can't enter, and of course, it's also black-letter law, you can't enter into a conspiracy to deny someone those rights. Now, I will acknowledge it in this unique, factual, if you pin down at the barest, barest bottom level- You've got 30 seconds to wrap it up. Fair enough. At the very bottom level, there is no situated, identical case like this that I can find anywhere in the country. I will- Can I ask one question? No, I'm just kidding. No, no. Just a technical record question. There is a letter, a February 22nd letter that your client sent to the tax tribunal. Correct. It is not in the record, is that right? That I don't know, I'm going to have to check. I think I have my binder with me, I can deal with that on reply. Did that letter mention the 2012 PRE, and my understanding is in February 13th or whatever, he went into the office to pay the taxes and was told that it was revoked or whatever. Correct. He sends this letter on the 22nd. We know that, I know that because it's referenced later. Yes. Is that letter, I'm wondering if that letter is possibly, could be construed broadly as an appeal of the decision to revoke the 2012 PRE, but I don't know what the content of that letter is. I believe it is in the record, I was just thinking here, I think it's Exhibit S to one of my responses to the motion for summary, now this would have been long after Mr. Kopke would have been out of the case unfortunately, but it's ECF 25-20, and I think it's the one starting on page ID 1032, which is the letter to Mr. It would have been a letter to him, wouldn't it? A letter to Mr. Kopke directly, yes. We've got the two letters that Kopke sent, and they reference the letter from your client, but we can't find the letter from your client in the record. I can look right now, I can look while we're sitting, but the best I can point you to is 25-20 is where I can point you to in that respect. Okay, all right, thank you, that's all I have. In five seconds responding here would be is that, I don't have all the confines and all the details of the conspiracy, but what I certainly have at this point is that in a conspiracy situation, we don't accept the conspirator's testimony or affidavit as, I'm not in a conspiracy. Something more has to be there. I should be given that opportunity to try to test that past the 12B6 stage, and that's what I'm asking this court to do. Very well, you'll have your rebuttal. Thank you very much. We'll hear from various appellees. Good morning, your honors. Gala Fish on behalf of Mr. Kopke. I'm arguing first to address Mr. Kopke briefly and allow the other defendants to address the more substantive aspects of this case. As this court is aware, Mr. Kopke was dismissed under 12B6 over four years ago while the case was still in the Western District, and while his role was not played in the complaint, he was the chief clerk of the tax tribunal, and so he essentially answered the calls and the emails on behalf of the tribunal. And so, as this court is already well aware, the only factual allegation is this alleged phone call between Kopke and DePriest. And to show a conspiracy, you at least have to have some kind of shared agreement to engage in unlawful action, and the alleged contents of this phone call demonstrate no kind of agreement, much less an agreement to violate due process. And the linchpin of due process argument is that Pong was deprived of the PRE without adequate notice, but there is no alleged discussion notice in this one phone call, much less an agreement between these two persons to together deprive Mr. Pong of notice. And at most in the complaint, there's a suspicion of wrongdoing by Mr. Pong, but a suspicion of wrongdoing is not sufficient to state a claim under 12B6. And as we argued below and argued before this court, qualified immunity provides an alternative basis for affirmance because Pong has not pled facts alleging that Kopke engaged in conduct that a reasonable state of officer would know violated clearly established rights. So the due process claim you construe is the notice on the foreclosure? The notice in the complaint, the allegation is that the PRE was revoked without adequate notice. Well, right. So back in 20, this is in that 2012 time period. I'm sorry, in the 2013 time period. Early 2013. With the February letters and whatnot. Yes. OK. Why wasn't that February letter an appeal of the revocation of the 20? I mean, it seems like this guy got jerked around with, I mean, he's clearly like saying, hey, I'm supposed to get this PRE and why are you taking it away from me in 2012, which then leads to the actual foreclosure. I mean, he's clearly appealing what the decision was, isn't he? He, it was, so I'll start by saying I also could not find that letter in the record and we were not part of the proceedings where the record was developed in the Eastern District. And so I also have the same letters that your honors have of the two from Mr. Kopke to Mr. Pong and then the follow-up letter from Mr. Pong. And so the original letter, I'm. But why isn't he allowed to appeal the revocation of his 2012 when he clearly is entitled to it, isn't he? Under the logic of the tax tribunal decision? Yes, and the proper process would have been to appeal that, well, first to go to the local tax assessor board. I'm not sure the, I can't think of the proper title off the top of my head, but there's the board where you appeal locally and then you could appeal that to the tax tribunal. So there is a proper process in place to do that. But. There's some sort of allegation that one of the things that he was not provided was a notice that he had a right to appeal. But there's no question in this record that he knew what his recourse was if he believed that that exemption was improperly denied. Because he did it twice. Correct, your honor. He did it for the group of three years, and then he was successful in getting it extended for two more years. So he knew what to do and how to do it and when to do it, right? Yes. And again, there's an allegation that Mr. Kopke had any involvement in the notice portion or any discussion relating to notice, which was again the center of the due process claim. Thank you, your honors. Okay, very well. Thank you. Good morning and may it please the court. Cynthia Filipowicz appearing on behalf of the defendant at police, Patricia DePriest, who is the assessor in this case. Plaintiff is here this morning seeking to reverse the district court's refusal to allow him a second bite of the apple on his conspiracy to violate his due process rights. He's also here seeking to reverse the district court's refusal to allow him to proceed on an equal protection claim, class of one, where no genuine issue of material fact remained for trial. This claim failed as a matter of law. Nothing in the record, nothing in plaintiff's briefing, nothing heard this morning provides a basis to allow plaintiff the relief he seeks. As to the due process, conspiracy to violate due process, we stand by Judge Hood's decision that Well, that's what we're here to review. Yes, sir, it is. And Judge Hood found that he was collaterally stopped from bringing this claim. I don't understand why, going back to my question, why he was denied the 2012 PRE given everything that had happened. Like, it seems completely irrational and illogical, almost conscience shocking to me. Why was he not deserving of the 2012 exemption given everything that had happened? Your Honor, the record shows that actually Ms. DePriest, the assessor, she actually provided the PRE. It was when she spoke to Mr. Kopke that she was advised to remove it. She is the assessor, so she was doing what she believed was correct. That, that advice, coupled with the prior opinion, which said it was limited to 27, 28, and 09. It didn't say in perpetuity, it said for these tax years. Had anything material changed in the meantime as to the eligibility for that? I believe, Your Honor, there is no dispute that the PRE established in 1994 has never been changed. We're not, he's not asking whether the PRE had changed. The question is whether the facts had changed. It seems to me the essence of this is that the tax people, correctly or incorrectly, seem to want to know whether the situation is the same in terms of the entitlement to the PRE for each particular year. And we're trying to figure out, given that it was the same apparently for five years, then what changed for the sixth year? That, Your Honor, I, I can, I don't know what Ms. DePriest was thinking. I don't know if there, if, you know, if there's a record as to her thought process. I do know that she did, as to Ms. DePriest, she did allow it. And then she was advised to remove it. That advice. Why did she call to ask if she did it properly? I'm not sure if that was a specific inquiry, Your Honor. Or if it was more part of a general discussion. I don't know if she specifically had doubts about that. But what the record does show is that she proceeded based upon advice and based upon this belief that this is what the prior tax tribunal opinion provided. But I think one thing to consider here is that we have to look at the whole of what this allegation is. Conspiracy to violate due process. So while there may be things in the record that, you know, perhaps leave one saying this specific act or this specific act, why or why not? What the record definitively shows is that Mr. Pong was provided notice of the removal of the PRE. Yeah, but you're saying these two, you're saying your client talked to Kopke. So there you go. We have a communication, okay. So if I'm talking about a conspiracy and saying, oh, there's two people, maybe they're in cahoots. Maybe they give him notice. He says he didn't get notice. Originally, he sends a letter on February 22nd, which unfortunately we don't have. But it seems like he's disputing the application of this PRE, which, by the way, he's entitled to, it seems to me. Somebody revokes it, pulls the rug out from under him when he's going to pay his taxes. So he's not really a scoffer. He's trying to pay his taxes. And then he's kind of jerked around in the appellate process and eventually told, well, you should have done this appeal. And I mean, I don't, maybe that happened. Maybe it didn't. Maybe there was a conspiracy. I mean, I guess we're just trying to ferret out whether there's enough of an allegation. But you can come up with a story, a nefarious one, I suppose. And I mean, I know he's got to do more than that in a complaint, but I mean. That's precisely it, Your Honor. And to come, you know, to come up with the story. But for conspiracy, it has to be pleaded with particularity. And in this instance, I'll direct the court, if I may, for each 13th of our brief, we remind the court that Ms. Dupree's attempted to get a new affidavit, refused to sign. Page 19 of our brief, plaintiff admits he was personally notified of the PRE denial.  Did he admit that he was timely notified of that? So he could have done something in the relevant period? It was for the. You're saying he was told when he showed up to pay his taxes and told that it was revoked, right? He was told you owe two grand more or whatever. That's the quote-unquote notice, right? It's not the written notice that says you have a right to appeal and all of this. Is that right? But we did provide written notices, Your Honor. Well, he says he never got that written notice. You say you provided it. Let's go back. That's what he also said about the foreclosure. And let's go back to the Michigan Court of Appeals decision. Well, I'm only interested in February of 2013, okay? So, I mean, you would have an affidavit that says I didn't receive notice. You have somebody that says I customarily sent all of these notices. Seems to me that would be a disputed fact, wouldn't it? Well, I'm citing here the Michigan Court of Appeals decision, April 18, 2017, where this is involving the foreclosure. Where similar allegations of non-receipt were made. And it says courts have long held that when a government sends a notice and receives no indication in response that something has gone awry, which is precisely the case here, the notice is constitutionally valid. It cites Jones 547 U.S. 226. We therefore conclude that the notice provided to respondent by petitioner was constitutionally sufficient. So, your honor, we have provided this. I don't want to belabor this, but I mean, Judge McKeague's point was he knew the process and he had appealed before, right? Exactly. Well, wait, that suggests to me maybe he didn't get notice this time. Since he knew, he knew how to appeal, maybe he didn't. I don't know. I mean, I'm not, and I know he, and he sent this letter on February 22. So, I don't know what it said. Maybe it said, hey, we, you know, obviously it would be great if we had that, but. And we can't guess, your honor. No, I agree with that. Is, I mean, just let me know if I'm understanding the record correctly. Do you have any basis other than your client's testimony for the proposition that these notices were sent? Other than she testified they were sent, yes. Okay, that's it. We don't have copies of them or anything like that that would corroborate her testimony or somehow put it, you know, beyond reasonable dispute that these things were sent. It's just her word. Is that fair? Not, I am not aware of the actual notices being part of the record. Okay, it's just her word. Under oath. Sure, okay. However, again, when the government says it sends the notices, it is presumed those notices were sent and received absent. Somebody's testimony to the contrary. Well. Well, I think, I think you've answered our questions. We're five minutes into the red, so I'm going to have to. Yes, we are, your honor. And I apologize for that, but thank you. No, not at all. Not at all. Any questions? So thank you for your argument. Thank you, your honor. We're going to hear from the gentleman who is with us on Zoom, Mr. Curlew. Thank you, your honors. You can hear me, I hope? Yes, yeah, we can. Yeah. I certainly appreciate the court's accommodation of my medical situation at the current time that allowed me to appear by Zoom. Just a couple points I want to hit based on what's been said in the preceding argument. First, I think it's a little erroneous to cite Treasurer Pickens as a tax official. His only involvement in the process is to do the collection after the assessor and the board and the locality have told him in bulk, without detail about whether a PRE or not was granted or how the assessment was made, that there is a delinquency. As pointed out in the brief, he has no statutory authority to second guess what's said by the report he receives, and to the extent he is involved in the process after the delinquency report is received by his office, the Michigan Court of Appeals made clear that what notices he was responsible to send, which deal with the foreclosure itself after the delinquency is reported to him, he met all the due process requirements he had to satisfy. As this court itself has pointed out, if there was a problem with the PRE denial, that was something for Mr. Pong to take up with the taxing assessment officials in the locality through the local assessor, the local board, and then the tax tribunal. That was not something to take up through Treasurer Pickens. He had no ability to do anything about that. He would have referred them, as he said in his testimony, back to the locality to address that problem, and to the extent he was involved with the foreclosure, the Michigan Court of Appeals has already said his actions as the treasurer were proper, so I don't believe there can be any complaint at all about what he did in the sense of due process. There's also no evidence that he was involved in any conspiracy beforehand. Again, by the time we got to the motion involving the individual actions of Treasurer Pickens, we were at a Rule 56 stage. That was time for Mr. Pong to put up or shut up, as this court has phrased it. What evidence there is in the record with regard to the supposed conspiracy is what evidence is in the record as it exists now, and there is nothing to suggest that there Mr. Kirlo, I guess one thing that you could say that might have been out of the ordinary was that your client, Pickens, had conversations with people at the tax tribunal. So he's asked that question in his deposition. I'm looking at it now. I will concede that one thing that I missed earlier is that your client says at this conference that he attended that he actually approached two people. He approached the chair of the tax tribunal, a gentleman named Kimball Smith, who's since deceased, and Mr. Kopke. And then he goes on to talk about how he asked them, meaning both of them, I guess, what he was supposed to do, and the answer is, yes, they told me to do exactly what the order said, no more, no less. So I guess that's the only thing that might be unusual about they were told to follow the tax tribunal's order. Is there anything else in the record that you're aware of beyond that? No, and what he did was follow the tax tribunal's judgment, no more, no less, and then as it was also modified by the subsequent 2015 ruling of the Court of Appeals on the second appeal, again, that only encompassed up through years 2011. This foreclosure was for year 2012. To the extent that Pickens knew, there was absolutely no basis for him to question what happened in 2012. Again, he doesn't know whether a PRE was even granted or not, and there's no evidence that he had any basis to know whether the PRE was granted or not, or anything else about how the assessment was made. And it's not his authority to question it once the report comes in. It is his statutory obligation to act upon the delinquency, and if there's a problem with the assessment, if there's a problem with the amount that's being claimed to be delinquent by the locality, then that's something Mr. Pund had to take up with the local taxing assessing authorities. Again, I don't see how you can accuse Mr. Pickens of a conspiracy when what he did is what he is statutorily required to do under the judgments and assessments that are given to him, and he has no choice otherwise, and is acting in accordance with the law. If anything, that certainly gives him immunity to the charge, even if the assessment he was working on was erroneous. And again, the word I would point out in the brief to this court used by Pund is that DePriest did this secretly. Well, there's no indication that, there's nothing in the record to say that Treasurer Pickens was in on the secret. The record also demonstrates, and this is laid out very detailed in my brief, that it was Assessor DePriest who did the actual paperwork that made the change on the assessment. Again, there's no indication that Treasurer Pickens had any role or he knew anything about it. He just got the bulk report of the delinquency and acted upon that delinquency as it was reported and as required by statute. He acted no different than he would with any other assessed delinquency that was reported to him. So there's no basis for that claim of conspiracy against him. As far as the assessment of the judgment, I want to make clear to the court, because it's not in the record, but despite our disputing of the mathematical calculation of the base surplus proceeds amount by the district court, which as I point out in the footnote has on its face a mathematical discrepancy and which was never addressed by any kind of evidentiary hearing, the county has in fact forwarded a check to Plaintiff's Counsel for the full amount of the judgment as the dollars were stated, $73,767.07. We wanted to cut off any argument for further accrual of interest, even though we continue to dispute and certainly intend to go back to the court with a motion to get a definition of the interest rate, if nothing else. Obviously the judgment on its face is incomplete, but the check, I have it here, it was, again this is not part of the record, but it was put into Mr. Ellison's IOLTA account. So that has been paid certainly good faith on the part of the county toward that, even though it is disputing the judgment. I see my time is up. I don't want to drag the court over and in my condition I'm not feeling particularly well this morning. Unless the court has further questions, I will rely on the brief for the other materials that I have pointed out. Thank you Mr. Curley. We sincerely appreciate your participation this morning and we wish you the very best. Thank you. We'll hear a rebuttal. We would dispute the argument that Mr. Curley just made because 211.7cc required the treasurer that once Ms. Pickens, excuse me, Ms. DePriest took away the PRE credit, at that point the control of the tax rolls had transferred to the county treasurer and the county treasurer was the only person who was authorized to alter the official tax record that made that amount due. The only way Ms. DePriest could actually effectuate the tax part of it is if she got Mr. Pickens to actually take away the PRE from the actual tax roll itself. Ms. DePriest needed Mr. Pickens' help. Is he exercising judgment or is that just ministerial? Well, it's our position is at that point he had knowledge, when the tax tribunal issues its decision, it issues it to the taxing authority who is responsible for the tax rolls at the time. You were talking about the five years beforehand, the five years leading up, every time the tax tribunal or the court of appeals ruled, Mr. Pickens was the one that literally had to go into the tax rolls and make the adjustments to the tax rolls themselves. But on a year-by-year basis, just as a matter of county government or whatever it is, it's DePriest that gives the PRE or not, right? Or applies it? She makes the decision on it, but the actual role of changing the tax rolls after December 31st of each year falls to Mr. Pickens. I thought Mr. Pickens said he just gets this in bulk. He doesn't know anything, any of the details. I know that's what he testified to, but that's directly contrary to 211.7 CC, which makes it his specific responsibility, not even his office, it's the treasurer that has that responsibility to do that. But this, again, is ministerial, isn't it? I mean, he's not revisiting DePriest's determination. He's like, okay, she says this, I make the entry, isn't it? I would agree that's right, but there's one caveat to that. The caveat is that he got a decision from the tax tribunal that 7, 08, 09, the PRE was wrongly taken away. He actually lost at the Court of Appeals at that point when Mr. Priests tried to take away the PRE for 10 and 11. So at that point, he himself had actual knowledge that five years of denial of PRE was legally wrong, and yet when he gets to 13, he tries to give us this role of, golly shucks, I'm just doing what I'm, you know, I'm just the lowly clerk pushing this paper through. He knew at that point that that PRE credit, at least based on two separate rulings of two separate tribunals. Is it within his power to do it? If DePriest says, I talked to Kopke or whatever, and they said 2012, no PRE, does he say, I disagree with both of you, you're completely wrong, which you are, because it's been, you know, because of what happened in 2007, 08, 09, or whatever, so I'm overriding that? He has the authority to override that, under 211, I believe it's 211, gosh, I'm trying to remember, that's KX code, it's very complex, he has the authority, responsibility and discretion not to, because if a tax is wrongly assessed, he has the authority to set aside that assessment and the enforcement of the tax delinquency on the basis that the tax is not actually owed. But what you're essentially saying is that he has this duty, as you say, arising under state law, to basically double check everything that he gets from DePriest and her colleagues and the other counties, townships, whatever it is, to make sure that what he got is accurate. Of course, yes, that would, yes, yes. Now, where do we drive this second guessing of the local tax authorities' decisions? Is that in the statute as well? That is not in, it is in the statute in that he has the ultimate responsibility for enforcement of validly due tax, and he had a ruling for that, but I'm trying to get from you, where do we find his duty to then verify that all the different assessments and tax documents were valid? Because at that point, he would have gotten two separate rulings for the five years previously that says that this tax is not owed. And the tax authorities told him that he should simply look at whatever year their opinions covered and that's what he should follow. One more step beyond that, though, I'm sorry. Is that correct before we take the one step beyond? At that point? They told him to look at the documents that he'd gotten from the tax tribunal and follow them. Yes, I would agree. And he did that? At that point, yes. Now, what you're saying is he should have then known that if the proper appeal had been filed for the following year, it would have been granted as well, and so he should have gone ahead and followed it? No. That's why I wanted to take it one step further. The one step further was by the time in spring, we'll call it spring of 2023, at that point on the records that he had from Mr. Priest is that the PRE credit was applied and granted. He was being asked by Mr. Priest to take it away at that point because, and of course at that point, he is the person who is the holder of the tax rules at that point. He's responsible for those tax rules. His logical question should have been at that point, really? I got two rules. I got a ruling from the tax tribunal and I got a ruling from the court of appeals that both say that this tax is not owed. Where does he have a ruling from the tax tribunal that applies to the year in question? He doesn't at the year in question. You wanted him to interpret the earlier ones and say that it would have applied to the year in question. I do because the PRE had already been granted and it was after the fact taking away that he was responsible ultimately for taking those tax rules, adjusting those tax rules and taking that credit away. He held the ultimate responsibility. He hears from the local tax person that there's been a mistake and asked to correct it. He's not supposed to do that. When he has rulings from two prior tribunals, two other higher level courts that say this is wrong, yes. For different years. But it's been nothing, you asked the question, what changed between. How does he know whether something had or had not changed? How does he know whether the heirs still live in the house? But it's my allegation. How does he know? Not your allegation. Just how is he supposed to know that? He's supposed to know that because at that point the PRE had already been granted for the 2012 taxes. He was being asked. And DePriest had told him that was an error, right? But after the rules had closed already. That's the important detail. He's not supposed to make corrections. If he hears from a local tax person like DePriest that I made a mistake, I shouldn't have done this and I'm correcting it, he's not supposed to do it. Just say yes or no. The answer is no. The answer has to be no. Where do I find the authority in the tax code for your answer no? That's all I want to know. I don't want to argue with you about it. I'm just trying to figure it out. What I'm trying to address here is that it would be no different than if, for example, a cop kicked in the door of someone and they said this was a Fourth Amendment violation. And then two years later he comes and kicks in the same door without a warrant at the same time. I mean, we're so far in the red, you've got to answer the exact question he's asking. Where do I find it in the statute? Just give me a site and I'll look it up. The site is, it's in there, there is under, I want to say it's 78k sub 9. And I'm not 100% sure. Perfect. I'll look for it. Thank you. But I'm not, if I can just tag it for you, it's in there, there are nine reasons why a tax treasurer, not the assessor, the treasurer has an obligation to set aside a tax delinquency. And one of them is errors of the tax assessor. He would have that authority to do that. Let me ask you a real general question. Is, I mean, is Pickens essential to the survival of your conspiracy claim or is it viable with just, you know, Kopke and DePriest? I think it's viable with just Kopke and DePriest, however, I think Pickens is a necessary component because the only person who could change the tax rules after December 31st in 2012 was Pickens. Yeah, but if he's just, you know, acting in a ministerial role and is sort of a dupe, I mean, I'm not trying to make your argument. I'm just trying to understand how this works. I think that would be a valid defense to argue, but I think that's a question for the jury then. All right. Can I ask one other technical question? My understanding is that the DePriest and Pickens conspiracy allegation went away on summary judgment on collateral estoppel grounds.  Right? Correct. There's a footnote that suggests maybe they wouldn't survive otherwise as well, but that's really not the basis for the court's decision. Is that right? That is correct. The district court's decision was collateral based on the foreclosure, not the PRE credit. I understand that. So that is the actual rationale from the district court. If we disagreed with that, perhaps it would be remanded or we could take an alternative ground for affirmance.  What I would ask this court to do is say, it literally was the first step of the analysis, and I think the judge would simply say, go start over again. The copy is just the 12B6 from the Western District. Correct.  That is correct. Okay. Very well. Thank you. Thank you very much. Thank you very much. Appreciate your time and patience this morning. All right. Case will be submitted.